IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

MIDAMERICA, INC.                                                    PLAINTIFF

v.                              Case No. 4:19-cv-04096

BIERLEIN COMPANIES, INC.                                         DEFENDANT

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff MidAmerica, Inc.'s Motion for Partial Summary Judgment. ECF No. 34. Defendant Bierlein Companies, Inc. responded in opposition to the motion (ECF No. 43), and Plaintiff replied. ECF No. 50. Also before the Court is Defendant's Motion for Summary Judgment. ECF No. 39. Plaintiff responded in opposition to that motion (ECF No. 48), and Defendant replied. ECF No. 49. The Court finds these matters ripe for consideration.

## BACKGROUND

This action stems from a construction project involving the decommission, demolition, and decontamination of a retired power plant. Defendant served as the general contractor on the project. Plaintiff served as a subcontractor to provide various environmental remediation and waste disposal services.

Plaintiff's tasks under the subcontract included cleaning Fuel Oil from the plant's pipelines and associated equipment and removing "Universal Waste." ECF No. 2-1. Before the project began, Defendant asked Plaintiff to prepare a bid for its services based on certain plans and specifications. Plaintiff contends that those documents expressly stated that the material it would be cleaning was No. 2 Fuel Oil. Plaintiff states that it conducted an on-site inspection of the power plant prior to submitting its bid. Plaintiff further states that during the inspection, an agent of the plant's owner, Entergy Arkansas, confirmed to Plaintiff that the material to be removed from the

plant's piping and associated equipment was No. 2 Fuel Oil. Plaintiff submitted a bid in the amount of $16,420.00 for the portion of the subcontract requiring the cleaning and disposal of Fuel Oil, and the parties subsequently executed a subcontract that incorporated the plant specifications originally provided by Defendant.[1]

Plaintiff states that after it commenced work on the project, it found that the material in the pipelines and associated equipment was No. 6 Fuel Oil instead of No. 2 Fuel Oil. There are six grades of Fuel Oil in the United States. The grades are referred to by number, ranging from No. 1 Fuel Oil to No. 6 Fuel Oil. As the number increases, so does the Fuel Oil's boiling point, carbon chain length, and viscosity. Consequently, No. 6 Fuel Oil is the most physically robust and is significantly more difficult and expensive to remove from piping and equipment in comparison to No. 2 Fuel Oil.

Plaintiff alleges that Defendant knew No. 6 Fuel Oil was present in the plant's pipes from the onset of the project and that Defendant misrepresented what material it was contracting Plaintiff to clean up in the plans and specifications it submitted to Plaintiff. Plaintiff further alleges that Defendant refused to allow Plaintiff to alter its bid after it discovered the No. 6 Fuel Oil, which would be significantly more costly to remove than No. 2 Fuel Oil. Ultimately, Plaintiff cleaned the No. 6 Fuel Oil under protest and at a cost that exceeded its bid price for the project. Plaintiff alleges that it incurred an additional $453,159.88 in costs to complete the work of removing the No. 6 Fuel Oil.

Plaintiff also states that the elemental mercury it removed during the project did not fall under "Universal Waste" in the scope of the subcontract. Plaintiff contends that its scope of work

---

[1] This amount, $16,420.00, only represents the amount Plaintiff bid to clean the plant's pipelines and associated equipment. The subcontract also required Plaintiff to perform other clean up, demolition, and environmental remediation duties. The total amount of the subcontract was $746,341.00.

did not include cleaning any mercury spills other than in a particular location on the project site. Plaintiff seeks $16,301.20 for the cost of this mercury removal it believes was outside the subcontract's scope of work.

Plaintiff commenced this action on August 20, 2019, seeking, in part, to recover the increased costs associated with removing No. 6 Fuel Oil instead of No. 2 Fuel Oil and the removal of elemental mercury. To this end, Plaintiff brought claims for breach of contract and unjust enrichment, alleging that Defendant materially misrepresented the scope of work that Plaintiff was to perform under the subcontract. On July, 28, 2020, Plaintiff filed its Motion for Partial Summary Judgment, arguing that there is no genuine dispute that (1) the documents and specifications provided by Defendant to Plaintiff for bidding contained a material misrepresentation regarding the work to be completed; and (2) the misrepresentation caused Plaintiff to incur additional costs in completing its work. Accordingly, Plaintiff moves the Court to rule as a matter of law that Defendant breached the parties' subcontract. That same day, Defendant filed its Motion for Summary Judgment, arguing that this action should be dismissed in its entirety because there is no genuine dispute that all the work performed by Plaintiff was contemplated by the parties' subcontract.

## LEGAL STANDARD

### I.   Summary Judgment

"Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Hess v. Union Pac. R.R. Co.*, 898 F.3d 852, 856 (8th Cir. 2018) (citation omitted). Summary judgment is a "threshold inquiry of . . . whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they reasonably may be

resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material only when its resolution affects the outcome of the case. *Id.* at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* at 252.

In deciding a motion for summary judgment, the Court must consider all the evidence and all reasonable inferences that arise from the evidence in a light most favorable to the nonmoving party. *Nitsche v. CEO of Osage Valley Elec. Co-Op*, 446 F.3d 841, 845 (8th Cir. 2006). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cnty. of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995). However, a party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

The same standard applies where, as here, the parties have filed cross-motions for summary judgment. Each motion should be reviewed on its own merits, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1998).

### II.     Applicable Law

When sitting in diversity, a federal court applies the choice of law rules of the forum state to determine whether the law of the forum state or a different state determines the outcome of the action. *See Potter v. St. Louis-San Francisco Ry. Co.*, 622 F.2d 979, 981 (8th Cir. 1980). In Arkansas, an effective choice of law provision in a contract negates the need to conduct a

4

significant relationship analysis to determine which law applies. *See Scottsdale Ins. Co. v. Morrowland Valley Co., LLC*, 411 S.W.3d 184, 189. (Ark. 2012). The agreement between Plaintiff and Defendant expressly states that the subcontract is controlled by the laws of Michigan. The parties agree that Michigan law controls the claims. The Court will therefore apply Michigan law.

A federal court is bound by the decisions of the highest court of the state whose laws it must apply. *See Quest Communications Co., LLC v. Free Conferencing Corp.* 905 F.3d 1068, 1074 (8th Cir. 2019). When the highest state court has not addressed a particular issue, a federal court applying that state's laws must make its best effort to determine how it would rule. *See id*; *see also Doe v. Baxter Healthcare Corp.*, 380 F.3d 399, 407 (8th Cir. 2004).

## DISCUSSION

Plaintiff's Motion for Partial Summary Judgment argues that Defendant breached the contract through violating the implied warranty of adequacy of design due to the presence of No. 6 Fuel Oil. Defendant's Motion for Summary Judgment argues that (1) all work done by Plaintiff fell within the scope of the subcontract; (2) Plaintiff is not entitled to additional payment for removal of certain quantities of Fuel Oil; (3) Plaintiff has already exhausted its exclusive remedy; and (4) Plaintiff's unjust enrichment claim fails. The Court will first address Plaintiff's narrower Motion for Partial Summary Judgment. The Court will then address Defendant's Motion for Summary Judgment.

### I.    Plaintiff's Motion for Partial Summary Judgment

Plaintiff contends that the court should rule as a matter of law that Defendant breached the terms of the subcontract for the removal of Fuel Oil during the project. Specifically, Plaintiff argues that the subcontract expressly stated that Plaintiff would be required to clean up only No. 2 Fuel Oil and it forged its bid accordingly. Plaintiff argues the presence of No. 6 Fuel Oil creates a

breach by Defendant of the implied warranty of design adequacy and thus a breach of the contract. First, the court will examine Michigan law regarding contracts and implied warranty of design adequacy. Then, the court will determine if that warranty could apply to a contract between private parties. If so, the Court will analyze Plaintiff's claims in order to resolve its request for Partial Summary Judgment.

### A.    Implied Warranty of Design Adequacy

Under Michigan law, a party claiming breach of contract must show that "(1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014). In *Hersey Gravel Co. v. State*, the Michigan Supreme Court held there was an implied warranty within a construction contract created by affirmative statements of the state government when soliciting bids from contractors. 9 N.W.2d 567, 569-70 (Mich. 1943).[2] The court reasoned that definitive statements regarding conditions in which the bidder would be working can be taken as true by the bidder due to the assumed superior knowledge of the state. *Id.* at 570. The court also determined that contract language requiring the bidding party to make itself familiar with all site conditions cannot undo the affirmative statements in project plans. *Id.* The court reasoned that the bidding party can believe that definitive statements regarding site conditions indicate prior analysis by the state regarding said conditions and make further examination redundant. *Id.* Therefore, that court held the discrepancy between the statements of the state and the conditions of the site violated this implied warranty and led to the damages of extra costs which created a breach of contract. *Id.* at 569-70.

---

[2] This type of implied warranty is known as the "warranty of design adequacy" and is "a firmly established principle of construction law, which has been adopted in virtually all jurisdictions." 4A Bruner & O'Connor, *Construction Law* §12:47 (2009).

The Michigan Supreme Court reaffirmed the existence of this implied warranty in a subsequent case involving a contract between a city government and a contractor for a sewer construction project. *See Valentini v. City of Adrian*, 79 N.W.2d 885, 887-89 (Mich. 1956). That court held that samples of subsoil conditions provided in project documents by the city created an implied warranty that the contractor could rely on when making its bid. *Id.* at 887. The differing subsoil conditions the contractor subsequently discovered and the correspondingly increased costs indicated a breach of the implied warranty and breach of contract. *Id.* at 888-89. In light of the positive affirmations of the subsoil samples, the court did not find that contract language requiring the contractor to personally examine the worksite negated the existence of the implied warranty. *Id.* at 887.

## B. Applicability to Private Contracts

Since the Michigan Supreme Court has only ruled on the implied warranty in situations where a government body is a party to the contract, this court must now determine if the Michigan Supreme Court would similarly apply the warranty to a situation involving only private parties. *See Quest Communications Co., LLC v. Free Conferencing Corp.* 905 F.3d 1068, 1074 (8th Cir. 2019). The underlying rationale in the *Hersey Gravel* decision was that the party making a construction bid on specific information that the owner of the project provided should be able to trust and rely on that information. 9 N.W.2d 567, 569-71 (Mich. 1943). The court never expressly stipulated that the existence of the implied warranty depended on one party being a government entity. *Id.* at 569-71. The court in *Valentini* relied on the reasoning from *Hersey Gravel* and similarly never conditioned the presence of the implied warranty on the fact that one party to the contract was a city government. 79 N.W.2d 885, 887-91 (Mich. 1956). The Court notes that there are instances of non-controlling case law from lower courts in Michigan that narrowly define the

warranty to situations with government contracts. *See Midwest Bridge Co. v. Dep't. of Transp.*, 350 N.W.2d 913, 915 (Mich. Ct. App. 1984); *Holloway Const. Co. v. State*, 205 N.W.2d 575, 581 (Mich. Ct. App. 1973). However, the Court finds the core consideration that created the warranty was that of fair dealing and not one party's status as a government entity. The reasoning of the controlling precedent articulates no exception for private contracts and the principles underlying the implied warranty are easily applicable to contracts between private parties. Therefore, this Court determines that the Michigan Supreme Court would apply the implied warranty to private contracts.[3]

### C. Application to Plaintiff's Claim

Plaintiff contends that by expressly mentioning only No. 2 Fuel Oil in the project specifications detailing work to clean up Fuel Oil, Defendant violated the implied warranty of design adequacy and should be held liable for breach of contract as a matter of law. The Court is not persuaded.

The requirement under Michigan law to consider the entirety of the contract in order to interpret it harmoniously and give every word meaning casts doubt on Plaintiff's argument. *See Laevin v. St. Vincent De Paul Society of Grand Rapids*, 36 N.W.2d 163, 164 (Mich. 1949). A section of the site specifications that is integrated into the contract mentions the presence of an empty No. 6 Fuel Oil storage tank on the premises of the project site.[4] ECF No. 40-1. While this does not explicitly state that there is No. 6 Fuel Oil at the site, it may reasonably lead one to believe

---

[3] This decision is buoyed by the reasoning of a separate federal court applying Michigan law that interprets the rule for the implied warranty in a way that makes no mention of the necessity of one party being a public entity. *See Performance Abatement Services, Inc. v. Lansing Bd. of Water and Light*, 168 F.Supp.2d 720, 733-34 (W.D. Mich. 2001); *See also Pat J. Murphy, Inc. v. Drummond Dolomite, Inc.*, 232 F.Supp. 509, 524-26 (E.D. Wis. 1964) (in which a federal court applying Michigan Supreme Court precedent held that the implied warranty applied in a contract between private parties).

[4] Articles 2 and 14 of the subcontract act to include site surveys and specifications as part of the subcontract. ECF No. 2-1.

8

that it will be present at the project site. The mention of the No. 6 tank must be considered together with the section listing No. 2 Fuel Oil as the substance that "may" be present to determine if there is a clear and affirmative statement as to site conditions to rule as a matter of law. Viewing these facts in the light most favorable to Defendant, the Court concludes that a reasonable fact finder could determine that there was not an express statement made by Defendant limiting Plaintiff's scope of work to No. 2 Fuel Oil. Accordingly, the Court cannot find that Plaintiff should prevail on its breach of contract claim regarding a violation of implied warranty of design adequacy as a matter of law.

## II. Defendant's Motion for Summary Judgment

The court will now address and analyze Defendant's Motion for Summary Judgment. Defendant argues that all Plaintiff's work on the project fell under the subcontract's scope of work and it should not receive additional compensation, that Plaintiff has already exhausted its exclusive remedy for differing site conditions under the subcontract, and that Plaintiff cannot use the theory of unjust enrichment for recovery in this situation. The court will not consider Defendant's desire for summary judgment as to the matter of the volume of Fuel Oil Plaintiff removed during the project.[5]

### A. Breach of Contract

Defendant argues that all cleanup work related to No. 6 Fuel Oil and elemental mercury fell within the scope of the subcontract.

---

[5] Plaintiff contends that its damages in extra costs were due to the grade of Fuel Oil it had to clean and remove. In its complaint, Plaintiff never puts forth an argument for breach of contract based on the volume of Fuel Oil. ECF No. 2. Plaintiff also never states that the volume of Fuel Oil it removed exceeded 5,000 gallons in its Statement of Undisputed Material Facts. ECF No. 35. Thus, the Court does not see a reason to rule on an issue inconsequential to Plaintiff's current theory of recovery.

### i. No. 6 Fuel Oil

Defendant contends that the subcontract clearly indicated that No. 6 Fuel Oil could be within the scope of work and that the contract language requiring examination of the site before making a bid acts as a waiver of the implied warranty. Defendant argues that Plaintiff should have been aware that the subcontract requirement for removal of all Fuel Oil could include No. 6 Fuel Oil. Defendant supports this claim by noting the language of the work description stating only that No. 2 Fuel Oil "may" be present and that the site specifications indicate the presence of an empty No. 6 Fuel Oil tank. Defendant argues further that if the subcontract language did not give Plaintiff notice of the type of Fuel Oil it may encounter, the required site visit should have properly informed Plaintiff of its potential scope of work. Defendant states that this requirement effectively waived any claim Plaintiff would have under an implied warranty. The Court is not persuaded.

As determined above, Michigan's implied warranty of design adequacy applies to contracts between private parties.[6] While the subcontract language of the work description for Fuel Oil removal states that certain listed materials "may" be encountered, the following table exclusively lists No. 2 Fuel Oil. ECF 38-4. Also, the mention of a No. 6 Fuel Oil tank in the site specifications does not necessarily mean that No. 6 Fuel Oil will be present. A representative for project owner Entergy also confirmed that only No. 2 Fuel Oil was present during Plaintiff's pre-bid site visit.[7] Considering these facts in the light most favorable to Plaintiff, a reasonable fact finder could

---

[6] The court similarly determines that the warranty applies to manmade conditions. The controlling Michigan Supreme Court precedents reasoned that the bidder is entitled to trust positive affirmations of the project owner since they are presumed to have superior knowledge of the project. *See Valentini v. City of Adrian*, 79 N.W.2d 885, 887-89 (Mich. 1956); *Hersey Gravel Co. v. State*, 9 N.W.2d 567, 569-70 (Mich. 1943). While those instances involved natural conditions, that court did not make any exclusion in the warranty for manmade conditions and did not base any of its reasoning on the difference between manmade and natural conditions. *Valentini*, 79 N.W.2d at 885-87; *Hersey Gravel*, 9 N.W.2d at 569-70. Therefore, this court does not find a compelling reason to treat manmade and natural site conditions differently under the implied warranty.

[7] Extrinsic evidence like this statement cannot alter the plain terms of a contract, but it can serve to inform the intentions of the parties and the construction of the contract when ambiguities arise. *See Goodwin, Inc. v. Coe*, 220 N.W.2d 664, 669 (Mich. 1974) (vacated in part on other grounds).

determine that affirmative statements were made in the contract to create an implied warranty of design adequacy.

Consequently, Defendant's argument that the subcontract's site visit requirement would inform Plaintiff of its scope of work must also fail. The controlling law clearly states that a warranty made by positive affirmations as to site conditions cannot be undone by language requiring a site inspection to determine scope of work. *See Valentini*, 79 N.W.2d at 887; *Hersey Gravel Co.*, 9 N.W.2d at 570. Defendant's citation to *Hunt Const. Grp., Inc. v. Constr. Servs., Inc.* as an example of site inspection requirements waiving the implied warranty is not persuasive because the party soliciting bids in that case was accused of simply not providing enough information instead of expressly misrepresenting the conditions. 375 F.Supp.2d 612, 619 (E.D. Mich. 2005). Since an implied warranty for design adequacy might be found regarding Fuel Oil, the Court cannot rule as a matter of law that Defendant did not breach the contract regarding the removal of Fuel Oil.

### ii. Elemental Mercury

Defendant contends that all elemental mercury cleanup was within the scope of work under the subcontract. Defendant states that Plaintiff was required to remove "Universal Waste" as part of the subcontract. Defendant then points to language in the project specifications that does not limit Universal Waste to only mercury-containing equipment. Defendant then reiterates that the Plaintiff must remove all mercury-containing equipment under the subcontract. Defendant argues that this language indisputably makes elemental mercury part of the contract and that Plaintiff's breach of contract claim for elemental mercury should fail as a matter of law. The Court is not persuaded.

Plaintiff notes that federal and Arkansas environmental regulations limit the definition of Universal Waste regarding mercury to mercury-containing equipment. *See* 40 C.F.R. § 273.4, § 273.9; Ark. Environmental Reg. No. 23 § 273. Plaintiff also notes that Arkansas and federal regulations consider elemental mercury to be a "Hazardous Waste." *See* 40 C.F.R. § 261.3; Ark. Environmental Reg. No. 23 § 261. Plaintiff argues that its express exclusion of elemental mercury from its bid and discussions with Defendant after discovery of elemental mercury on the project site indicate that removing elemental mercury was not within its scope of work. Though this extrinsic evidence cannot work to change the plain language of the subcontract, it can be used to better understand the intent of the parties when uncertainty and ambiguity arises. *See Goodwin, Inc. v. Coe*, 220 N.W.2d 664, 669 (Mich. 1974) (vacated in part on other grounds). While the language of the contract does not limit Universal Waste to mercury-containing devices, it does not explicitly include elemental mercury. Taken together in the light most favorable to Plaintiff, these facts indicate that a reasonable jury could conclude that removing elemental mercury fell outside Plaintiff's scope of work under the subcontract. Therefore, the Court cannot rule as a matter of law that Defendant did not breach the contract regarding cleanup of elemental mercury.

### B. Exclusive Remedy

Defendant argues that, even if Plaintiff performed tasks outside the subcontract's scope of work, Plaintiff has exhausted its exclusive means of recovery under the subcontract. Defendant points to the exclusive remedy provision in Section 12.1 of the subcontract for support. That section states the only remedy Plaintiff could have for claims arising from differing site conditions or breaches of warranty by the Owner is to submit the claim through Defendant to the Owner. *See* ECF No. 2-1 § 12.1. The section ends with: "The processing of such claims by the Contractor shall be the Subcontractor's sole and exclusive remedy against the Contractor with respect to such

claims." ECF No. 2-1 § 12.1. Defendant states that it has submitted Plaintiff's claims for extra costs related to differing site conditions to Entergy and has therefore fulfilled its obligation under the subcontract. With that completed, Defendant urges that Plaintiff has no other remedy for its breach of contract claims. The Court is not persuaded.

A principle of contract law in Michigan is that each party to a contract must have some means of remedy for a breach by the other party. *See M & D Robinson Co. v. Dunitz*, 162 N.W.2d 318, 320 (Mich. Ct. App. 1968). A court must assume that parties to a contract intend for it to be enforceable and should construct the contract in a way to make it align with law when possible. *See Cruz v. State Farm Mut. Auto Ins. Co.*, 648 N.W.2d 591, 599 (Mich. 2002). Good faith and fair dealing underlie every contract and no party to one should act in a manner that works to undermine the other party's right to the benefits of the contract. *See Hammond v. United of Oakland, Inc.*, 483 N.W.2d 652, 655 (Mich. Ct. App. 1992).

Defendant's interpretation of the subcontract creates the possibility that a legitimate breach of contract claim by Plaintiff can fail simply because neither Entergy nor Defendant decide to respect Plaintiff's request for reimbursement. That would mean Plaintiff's sole remedy ceases to exist in a situation where other parties simply disregard or disagree with Plaintiff's claims. If the exclusive remedy section allows Defendant flexibility of performance and to process Plaintiff's claims as it sees fit, it is still bound by the requirement to proceed in good faith. *See Burkhardt v. City Nat. Bank of Detroit*, 226 N.W.2d 678, 680 (Mich. Ct. App. 1975). Defendant's refusal to seek reimbursement for Plaintiff any other way than to request it from Entergy and then absolve itself of the matter could be viewed as a failure to fulfill its end of the exclusive remedy in good faith. Adding further weight to Plaintiff's contention is the arbitration section in the prime contract to handle disagreements between Defendant and Entergy. *See* ECF No. 47. It shows that Defendant

13

potentially had the means to seek reimbursement from Entergy for payments to Plaintiff if it proceeded in good faith. In light of these considerations, a reasonable fact finder could determine that Defendant has not fulfilled its obligation to Plaintiff under the exclusive remedy provision of the subcontract. Accordingly, the Court cannot rule as a matter of law that Plaintiff has already exhausted its exclusive remedy for its breach of contract claims.

### C. Unjust Enrichment

Defendant contends that Plaintiff is legally barred from proceeding under a theory of unjust enrichment in this instance. Defendant argues that all work Plaintiff did was subject to an express contract and that it cannot show how Defendant was unjustly benefitted.  The Court is not persuaded.

Unjust enrichment occurs when one party receives benefits that rightly belong to another and the retention of such benefit is unjust and results in an inequity. *See Tkachik v. Mandeville*, 790 N.W.2d 260, 266 (Mich. 2010). To prevail on a claim of unjust enrichment, a plaintiff must show "(1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to plaintiff from defendant's retention of the benefit." *See Bellevue Venture, Inc. v. Morang-Kelly Inv., Inc.*, 836 N.W.2d 898, 901 (Mich. Ct. App. 2013). An implied contract is created under law to prevent unjust enrichment in such cases. *See id*. An exception is that no contract will be implied if there is an express contract covering the matters at issue. *See id.* However, an implied contract can be created when a party seeks recovery for actions not covered by an express contract. *See Cascade Elec. Co. v. Rice*, 244 N.W.2d 774, 777 (Mich. Ct. App. 1973).

As determined above, there is the possibility that Plaintiff can prove it performed work on the project outside the scope of its express contract with Defendant. Consequently, Plaintiff can potentially show that an implied contract was created when it performed work it argues was not

contemplated by the express contract. The obvious benefit retained by Defendant under that scenario would be the work Plaintiff contributed to the project for which Defendant was the general contractor. The inequity arises in the great disparity in the costs Plaintiff incurred to conduct the work necessary on the project and the amount of payment Plaintiff received due to its bid anticipating a qualitatively different scope of work. A reasonable fact finder could determine that Defendant unjustly received the benefit of a completed project by not compensating Plaintiff for work it performed outside the scope of its subcontract that aided in the project's completion. Accordingly, the court cannot rule that Plaintiff's unjust enrichment claim against Defendant should fail as a matter of law.

## CONCLUSION

For the reasons stated above, the Court finds that Plaintiff's Motion for Partial Summary Judgment (ECF No. 34) and Defendant's Motion for Summary Judgment (ECF No. 39) should be and are hereby **DENIED**.

**IT IS SO ORDERED**, this 9th day of October, 2020.

/s/ Susan O. Hickey
Susan O. Hickey
Chief United States District Judge